# ADVERSARY PROCEEDING COVER SHEET
## (Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| J.J.D.&S., L.L.C. | Louis Alma Jessop<br>aka Alma Jessop |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Matthew G., Bagley, Cohne, Rappaport & Segal<br>257 East 200 South, Suite 700<br>Salt Lake City, UT  84111   (801) 532-2666 | Christopher R. Kaup, Tiffany & Bosco, P.A.<br>Third Floor Camelback Esplande II<br>2525 East Camelback Road<br>Phoenix, AZ  85016-4237   (602) 2556000 |

**PARTY** (Check one box only)    ☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint by Judgment Creditor to Determine Judgment debt
non-dischargeable, in U.S.C. Section 523.

## NATURE OF SUIT
### (Check the one most appropriate box only.)

☐ 454  To Recover Money or Property
☐ 435  To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
☐ 458  To obtain approval for the sale of both the interest of the estate and of a co-owner in property
☐ 424  To object or to revoke a discharge 11 U.S.C. § 727

☐ 455  To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan
☒ 426  To determine the dischargeability of a debt 11 U.S.C. § 523
☐ 434  To obtain an injunction or other equitable relief
☐ 457  To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456  To obtain a declaratory judgment relating to any of foregoing causes of action
☐ 459  To determine a claim or cause of action removed to a bankruptcy court
☐ 498  Other (specify)

| ORIGIN OF PROCEEDINGS (Check one box only.) | ☒ 1 Original Proceeding | ☐ 2 Removed Proceeding | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another Bankruptcy Court | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|

| DEMAND<br>$ 128,708.09 | OTHER RELIEF SOUGHT | ☐ JURY DEMAND<br>Check only if demanded in complaint |
|---|---|---|

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR<br>Louis Alma Jessop | BANKRUPTCY CASE NO.<br>2:06-bk-01762 | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>Arizona | DIVISIONAL OFFICE<br>Phoenix | NAME OF JUDGE<br>Randolph J. Haines |

## RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

| FILING FEE (Check one box only.) | ☒ FEE ATTACHED | ☐ FEE NOT REQUIRED | ☐ FEE IS DEFERRED |
|---|---|---|---|

| DATE<br>9/8/06 | PRINT NAME<br>Matthew G. Bagley | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|

BENJAMIN C. GREEN (AZ Bar No. 19107)
ABERNETHY & GREEN, PLC
3838 N. Central Ave., Suite 1750
Phoenix, AZ 85012-3501
Telephone: (602) 266-2222

MATTHEW G. BAGLEY (Pro Hac Vice)
COHNE RAPPAPORT & SEGAL
257 East 200 South, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-2666

Attorneys for Adversary Proceeding Plaintiff

---

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>    LOUIS ALMA JESSOP,<br><br>        Debtor. | Chapter 7<br><br><br>Case No. 2:06-bk-01762-RJH |
| J.J.D.&S., L.L.C., a Utah limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>LOUIS ALMA JESSOP aka ALMA JESSOP,<br><br>      Defendant. | Adversary No.<br><br>**COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT** |

Plaintiff J.J.D.&S., L.L.C. complains of Defendant Louis Alma Jessop aka Alma Jessop, and alleges as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff J.J.D.&S., L.L.C. ("JJDS") is a Utah limited liability company in good standing with its offices and principal place of business in Salt Lake County, State of Utah.

2.      Defendant Louis Alma Jessop, also known as Alma Jessop ("Jessop") is an individual residing in Glendale, State of Arizona.

3.      On June 14, 2006, Jessop filed a petition in this Court for relief under 11 U.S.C. Chapter 7.

4.      This adversary proceeding arises under or is related to a case under Title 11 of the United States Code. Therefore, this Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b).

5.      Venue in this action is properly laid in this District pursuant to 28 U.S.C. § 1409(a).

6.      The subject matter of this adversary proceeding relates to determination of the dischargeability of a debt. Therefore, this proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## GENERAL ALLEGATIONS

7.      From late 2002 to late 2005, JJDS was engaged in litigation in the Utah State Third District Court with numerous parties in relation to claims arising from the construction of a reception center in Salt Lake County, State of Utah. JJDS was the owner of the project, and Jessop was the principal of the general contractor for the project.

2

8.     On or about August 6, 2003, JJDS was granted leave by the Utah State Third District Court to file a Third-party Complaint against Jessop alleging several causes of action, two of which were based on legal theories of fraud and breach of fiduciary duty, and on or about March 5, 2004, JJDS was granted further leave to file an amended pleading alleging the same causes of action against Jessop.  (Second amended pleading of JJDS attached hereto as Exhibit "A.")

9.     In its pleadings, JJDS claimed that at least $52,239.56 of construction loan proceeds administered to and deposited by Jessop into three separate bank accounts, which proceeds were expressly allocated or earmarked for subcontractors and suppliers on a construction project, were not paid to those subcontractors and suppliers, despite Jessop's representations and promises that he would make such payments.

10.     At a bench trial of this matter in the Utah State Third District Court (Civil No. 020908491), after two days of an evidentiary trial and after a further post-trial special briefing and accounting of project disbursements requested by the trial court, Jessop was unable to account for the $52,239.56 in loan proceeds.

11.     The trial court found that Jessop was liable to JJDS for the unaccounted-for loan disbursements in the principal amount of $52,239.56, together with pre-judgment interest, attorneys fees and court costs, for a total judgment amount of $128,708.09.  The trial court based its judgment upon fraud and breach of fiduciary duty causes of action pled by JJDS in its pleadings and presented at trial.  (See Order of Final Judgment against Third-party Defendant Alma Jessop and in Favor of Third-Party Plaintiff, J.J.D.&S., L.L.C., attached hereto as Exhibit "B.")

3

## FIRST CAUSE OF ACTION
### (Non-dischargeability of Obligation - Fraud)

12.     JJDS incorporates the allegations of ¶¶ 1-11 as if fully set forth herein.

13.     JJDS incorporates the allegations of ¶¶ 12-45 and ¶¶ 57-71 of the Third-party Claims contained in Exhibit "A" attached hereto if fully set forth herein.

14.     Jessop intentionally or recklessly misappropriated construction loan funds released to him for use on JJDS's construction project, and misappropriated the same for either his personal use or misallocated and expended the same on other unrelated construction projects or obligations.

15.     Jessop represented to the construction loan lender that he would disburse and pay from construction loan draws all relevant subcontractors and suppliers who had completed work or provided material and services on JJDS's construction project during the relevant draw periods.

16.     At such time that Jessop obtained construction loan proceeds and deposited them into his corporate or individual accounts, he knew his representations of payment to relevant subcontractors and suppliers, or of certain work actually performed, to be false, or such representations were made recklessly with little or no intent of actually making such payments in either a timely fashion or in the amounts allocable to the identified payees.

17.     Jessop's representations regarding payment and disbursement of construction loan funds, or of work actually performed, were false and intentionally so to the extent that Jessop misappropriated such funds to other uses or other construction projects, commingled such funds with Jessop's personal funds, misappropriated such funds to the Jessop's personal use and benefit, or otherwise failed to pay relevant subcontractors and suppliers on JJDS's construction project to whom Loan proceeds were intended and allocated.

4

18.     Both the construction loan lender and JJDS, acting reasonably, justifiably and in ignorance of the false nature of Jessop's representations of actual work performed or direct payment to relevant subcontractors and suppliers in releasing construction loan proceeds to Jessop, relied upon Jessop's representations in doing so, and were induced by such representations to accede to Jessop's requests.

19.     As a direct and proximate result of reliance on Jessop's representations, and as a result of Jessop's misappropriation, misallocation and wrongful dissipation of construction loan proceeds released to Jessop and intended solely for use on JJDS's construction project, JJDS was forced to pay otherwise unpaid subcontractors and suppliers on the project a sum no less than $52,239.56 out-of-pocket in order to complete the project and commence scheduled business operations, and was induced to pay construction loan proceeds to the excavation subcontractor for work that had not been performed.

20.     A final judgment was entered by the Utah State Third District Court against Jessop on or about January 31, 2006, after a trial and briefing on the alleged facts and consideration of the evidence submitted in support thereof.

21.     The trial court concluded that Jessop committed fraud by obtaining JJDS loan proceeds under false pretenses and representations.

22.     Jessop was found liable to JJDS for the fraudulently acquired funds together with pre-judgment interest, attorneys fees and court costs, for a total judgment amount of $128,708.09.

23.     The Utah state court judgment was based in part on the fraud cause of action as pled in JJDS's Third-party Complaint against Jessop, and was obtained in a Utah state court.

5

24.     The obligation owed by Jessop pursuant to the trial court's judgment is a debt for money, property or services obtained by false pretenses, false representations, and actual fraud, and should be declared non-dischargeable pursuant to 11 U.S.C. § 532(a)(2).

**SECOND CAUSE OF ACTION**
**(Non-dischargeability of Obligation - Fraud or Defalcation in Fiduciary Capacity)**

25.     JJDS incorporates the allegations of ¶¶ 1-24 as if fully set forth herein.

26.     JJDS incorporates the allegations of ¶¶ 12-45 and ¶¶ 72-75 of the Third-party Claims contained in Exhibit "A" attached hereto if fully set forth herein.

27.     In relation to the construction loan proceeds that Jessop arranged to have directly disbursed to him and which were allocated or earmarked for specific subcontractors and suppliers working on JJDS's project, Jessop controlled the disposition of such funds on JJDS's behalf as well as the relevant subcontractors and suppliers meant to be paid therefrom; such funds represented claims of relevant subcontractors and suppliers on JJDS; and JJDS was wholly dependent upon Jessop to see that JJDS's interest were protected when Jessop was or should have been dealing with relevant subcontractors and suppliers.

28.     Jessop, by taking upon himself the obligation to disburse loan construction proceeds to relevant subcontractors and suppliers on JJDS's project, had a strict fiduciary duty to ensure that construction loan proceeds were allocated and used solely for the payment of subcontractors and suppliers actually providing work, materials and supplies to JJDS's project; not to use or divert such earmarked funds for any other purpose, persons, uses or materials not associated nor connected with JJDS's project for which they were expressly earmarked and meant to fund; and not to commingle such proceeds with Jessop's personal funds.

6

29. Jessop committed a defalcation of his fiduciary duty to properly use and disburse construction loan proceeds inasmuch as he misappropriated or dissipated such funds held in his fiduciary capacity and has failed to properly account for or be able to produce at least $52,239.55 of such funds.

30. A final judgment was entered by the Utah State Third District Court against Jessop on or about January 31, 2006, after a trial and briefing on the alleged facts and consideration of the evidence submitted in support thereof.

31. The trial court found Jessop committed a defalcation of his fiduciary duty to properly use and disburse entrusted construction loan proceeds inasmuch as he misappropriated or dissipated such funds held in his fiduciary capacity and failed to properly account for or be able to produce at least $52,239.55 of such funds.

32. Jessop was found liable to JJDS for the amount of the misappropriated funds together with pre-judgment interest, attorneys fees and court costs, for a total judgment amount of $128,708.09.

33. The Utah state court judgment was based in part on a breach of fiduciary duty cause of action as pled in JJDS's Third-party Complaint against Jessop, and was obtained in a Utah state court.

34. The obligation owed by Jessop pursuant to the trial court's judgment is a debt for money, property or services obtained by fraud or defalcation while acting in a fiduciary duty, and should be declared non-dischargeable pursuant to 11 U.S.C. § 532(a)(4).

7

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff J.J.D.&S., L.L.C. requests judgment as follows:

1.        For a declaration of this Court that the amount of $128,708.09 awarded to J.J.D.&S., L.L.C. pursuant to the Judgment awarded to it and against Jessop by the Third District Court for the State of Utah, is excepted from discharge under 11 U.S.C. § 523(a)(2);

2.        For a declaration of this Court that the amount of $128,708.09 awarded to J.J.D.&S., L.L.C. pursuant to the Judgment awarded to it and against Jessop by the Third District Court for the State of Utah, is excepted from discharge under 11 U.S.C. § 523(a)(4); and

3.        For such other and further relief as the Court deems just.

**DATED** this 11th day of September, 2006.

COHNE RAPPAPORT & SEGAL

_____
Matthew G. Bagley
Attorneys for Adversary Proceeding Plaintiff

F:\MATT\jjds\comp2 jessop.wpd

8

FILED DISTRICT COURT
Third Judicial District

FEB 0 2 2004

By _____ SALT LAKE COUNTY

Deputy Clerk

DOUGLAS E. GRIFFITH (4042)
MATTHEW G. BAGLEY (6820)
KESLER & RUST
2000 Beneficial Life Tower
36 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 532-8000
Attorneys for Defendant J.J.D.&S., L.L.C.

## IN THE THIRD DISTRICT COURT OF SALT LAKE COUNTY

## STATE OF UTAH

| | |
|---|---|
| ENSIGN ENGINEERING AND LAND SURVEYING, INC., a Utah Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>JJD&S, L.L.C., a Limited Liability Company and LA CONSTRUCTION, INC., a Utah Corporation,<br><br>Defendants. | **SECOND AMENDED ANSWERS, COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT**<br><br>Consolidate Civil Nos. 020908491 and 020410426<br><br>Judge L.A. Dever |
| THE MITCHELL COMPANY, L.C.,<br><br>Plaintiff,<br><br>vs.<br><br>LA CONSTRUCTION, INC, a Utah corporation, and JJD & S, LLC, a Utah limited liability company,<br><br>Defendant. | |

J.J.D.&S., L.L.C., a Utah limited liability company, :

                   Third-party Plaintiff,            :

                                                     :

        vs.                                          :

                                                     :

ALMA JESSOP; TAMMY LYNN JESSOP;                      :
BRIGHTON BANK a Utah corporation; JOHN               :
DOES 1-5; and CONCRETE CONNECTION,                   :
INC., a Utah corporation,                            :

                                                     :

                   Third-party Defendants.           :

## ANSWER
### (Ensign Engineering and Land Surveying, Inc.)

Defendant J.J.D.&S., L.L.C. ("JJDS") answers the Complaint filed by Plaintiff Ensign

Engineering and Land Surveying, Inc. ("Ensign") as follows:

1.      JJDS admits the allegations of ¶¶ 1-3.

2.      In response to the allegations of ¶ 4, JJDS admits that the real property that is the

subject matter of these proceedings is located in Salt Lake County, State of Utah, but denies that any

of the liens filed thereon are valid or enforceable.

3.      JJDS admits the allegations of ¶ 5.

4.      In response to the allegations of ¶ 6, JJDS incorporates its responses to ¶¶ 1-5 by

reference as though fully set forth herein.

2

5.      In response to the allegations of ¶¶ 7-8, JJDS alleges that the contract referenced therein speaks for itself.

6.      The allegations of ¶ 6 are ambiguous, and do not specify which Defendant is meant. JJDS admits that LA Construction has been paid the reasonable value of its work on the Project, exclusive of damages caused to JJDS and occasioned by LA Construction's several breaches of contract and acts of fraud, as detailed below.

7.      JJDS is without sufficient knowledge to either admit or deny the allegations of ¶¶ 10-13, and therefore denies the same.

8.      In response to the allegations of ¶ 14, JJDS incorporates its responses to ¶¶ 1-13 by reference as though fully set forth herein.

9.      JJDS admits the allegations of ¶¶ 15-16.

10.     JJDS denies the allegations of ¶¶ 17-19.

11.     JJDS has insufficient information to either admit or deny the allegations of ¶ 20, and therefore denies the same.

12.     JJDS denies the allegations and legal conclusions of ¶ 21.

13.     In response to the allegations of ¶ 22, JJDS responds that the referenced lis pendens speaks for itself, and denies any allegations contrary to or at variance with the contents of the lis pendens as found on its face.

14.     JJDS denies the allegations and legal conclusions of ¶ 23.

3

15.     In response to the allegations of ¶ 24, JJDS incorporates its responses to ¶¶ 1-23 by reference as though fully set forth herein.

16.     JJDS admits the allegations of ¶¶ 25-27.

17.     In response to the allegations of ¶ 28, JJDS incorporates its responses to ¶¶ 1-27 by reference as though fully set forth herein.

18.     JJDS denies the allegations of ¶¶ 29-33.

19.     JJDS denies all allegations contained in Ensign's Prayer for Relief.

20.     JJDS denies all allegations of Ensign's Complaint not expressly admitted above.

<u>FIRST AFFIRMATIVE DEFENSE</u>

Ensign's Complaint fails to state a cause of action against JJDS upon which relief can be granted.

<u>SECOND AFFIRMATIVE DEFENSE</u>

Ensign's claims against JJDS are barred by the doctrine of accord and satisfaction.

<u>THIRD AFFIRMATIVE DEFENSE</u>

Ensign's claims against JJDS are barred by waiver and estoppel.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

Ensign's claims against JJDS are barred by the doctrine of unclean hands.

4

## FIFTH AFFIRMATIVE DEFENSE

Re-work necessitated by Ensign's defective or unworkmanlike performance equaled or exceeded amounts demanded in either Ensign's Notice of Lien or its Complaint, and thus the amount needed to perform such re-work offsets in whole or in part amounts claimed by Ensign.

## SIXTH AFFIRMATIVE DEFENSE

Ensign's lien against the subject real property is an improper lien as defined under Utah Code Ann. §§ 38-9-1 et seq., a wrongful lien as defined under Utah Code Ann. § 38-1-25, or an abusive lien as defined under Utah Code Ann. § 38-1-25.

## SEVENTH AFFIRMATIVE DEFENSE

Amounts for which Ensign has liened the subject real property are allocable, either in whole or in part, to work, material or services that was not incorporated into the property, or in the alternative, the amounts demanded by Ensign do not represent the reasonable value of the work provided by Ensign to and incorporated into the construction project at issue.

## EIGHTH AFFIRMATIVE DEFENSE

Ensign failed to serve proper notice of its purported lien on JJDS or any of its authorized representative or agents within the statutorily-required time, and is therefore precluded from claiming attorneys fees or costs pursuant to Utah Code Ann. § 38-1-7(4)(c).

## NINTH AFFIRMATIVE DEFENSE

Ensign's claims against JJDS are barred by a lack or failure of consideration.

5

## TENTH AFFIRMATIVE DEFENSE

Ensign's claims against JJDS are barred by the Statute of Frauds.

## ELEVENTH AFFIRMATIVE DEFENSE

JJDS reserves the right to amend its affirmative defenses as further information becomes available.

## PRAYER FOR RELIEF

Wherefore, Defendant J.J.D.&S., L.L.C. prays for relief against Plaintiff Ensign Engineering and Land Surveying, Inc. as follows:

1.      That Plaintiff Ensign's Complaint as against JJDS be dismissed, no cause of action;

2.      That Defendant JDDS be awarded all attorneys fees, costs, and penalties as permitted under Utah Code Ann. §§ 38-9-1 et seq., or alternatively, Utah Code Ann. § 38-1-25; and

3.      For such other relief as the Court may deem just and equitable.

## ANSWER
### (The Mitchell Company, L.C.)

Defendant JJDS answers the Complaint filed by Plaintiff The Mitchell Company, L.C. ("Mitchell") as follows:

1.      JJDS admits the allegations of ¶¶ 1-3.

2.      In response to the allegations of ¶ 4, JJDS admits that LA Construction and Mitchell entered into a contract in relation to the construction project at issue ("the Project"), but has insufficient knowledge to either admit or deny the terms or conditions of such contract, avers that

6

it was not a party to such contract and that it had no direct contractual relationship with Mitchell, and denies any implication that Mitchell's alleged "time and materials" basis for compensation under the LA Construction-Mitchell contract in any way absolves Mitchell from responsibility or liability for Mitchell's own defective, unacceptable or non-compliant work or for any instances of fraudulently and intentionally overbilled invoices not representing actual work.

3. In response to the allegations of ¶ 5, JJDS admits that Mitchell carried out work on the Project, but denies any remaining allegations of ¶ 5.

4. The allegations of ¶ 6 are ambiguous, and do not specify which Defendant is meant. JJDS is without sufficient information to either admit or deny the allegations of ¶ 6, and therefore denies the same.

5. JJDS admits the allegations of ¶ 7.

6. JJDS denies the allegations of ¶ 8.

7. In response to ¶ 9, JJDS admits that Mitchell did provide work on the referenced real property at the instruction of LA Construction, but is without sufficient knowledge to either admit or deny the remaining allegations of ¶ 9, and therefore denies the same.

8. In response to the allegations of ¶10, JJDS admits that the referenced mechanics lien was filed, but denies all remaining allegations of ¶ 10.

9. JJDS admits the allegations of ¶ 11.

10. JJDS denies the allegations of ¶ 12.

7

11.   JJDS denies all allegations contained in Mitchell's Prayer for Relief.

12.   JJDS denies all allegations of Mitchell's Complaint not expressly admitted above.

## FIRST AFFIRMATIVE DEFENSE

Mitchell's Complaint fails to state a cause of action against JJDS upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Mitchell's claims against JJDS are barred by the doctrine of accord and satisfaction.

## THIRD AFFIRMATIVE DEFENSE

Mitchell's claims against JJDS are barred by waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Mitchell's claims against JJDS are barred by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Re-work necessitated by Mitchell's defective or unworkmanlike performance, in addition to time delay damages associated with such re-work, equaled or exceeded amounts demanded in either Mitchell's Notice of Lien or its Complaint, and thus the amount needed to perform such re-work offsets in whole or in part amounts claimed by Mitchell.

8

## SIXTH AFFIRMATIVE DEFENSE

Mitchell's lien against the subject real property is an improper lien as defined under Utah Code Ann. §§ 38-9-1 et seq., a wrongful lien as defined under Utah Code Ann. § 38-1-25, or an abusive lien as defined under Utah Code Ann. § 38-1-25.

## SEVENTH AFFIRMATIVE DEFENSE

Amounts for which Mitchell has liened the subject real property are allocable, either in whole or in part, to work, material or services that was not incorporated into the property, or in the alternative, the amounts demanded by Mitchell do not represent the reasonable value of the work provided by Mitchell to and incorporated into the Project.

## EIGHTH AFFIRMATIVE DEFENSE

Significant portions of Mitchell's claimed amounts of work or amounts for which Mitchell has liened the Property are based upon double billings and other instances of erroneous and/or fraudulent billings, and do not represent charges for actual work done.

## NINTH AFFIRMATIVE DEFENSE

Mitchell's claims against JJDS are barred by a lack or failure of consideration.

## TENTH AFFIRMATIVE DEFENSE

Mitchell's claims against JJDS are barred by the Statute of Frauds.

9

## ELEVENTH AFFIRMATIVE DEFENSE

JJDS reserves the right to amend its affirmative defenses as further information becomes available.

## PRAYER FOR RELIEF

Wherefore, Defendant J.J.D.&S., L.L.C. prays for relief against Plaintiff The Mitchell Company, L.C., as follows:

1.      That Plaintiff Mitchell's Complaint as against JJDS be dismissed, no cause of action;

2.      That Defendant JJDS be awarded all attorneys fees, costs, and penalties as permitted under Utah Code Ann. §§ 38-9-1 et seq., or alternatively, Utah Code Ann. § 38-1-25; and

3.      For such other relief as the Court may deem just and equitable.

## **COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY CLAIMS**

Defendant J.J.D.&S., L.L.C. counterclaims against Plaintiffs Ensign Engineering and Land Surveying, Inc. and The Mitchell Company, L.L.C., cross-claims against Defendant L.A. Construction, Inc., and complains of Third-party Defendants Alma Jessop, Tammy Lynn Jessop and Brighton Bank, and for cause of action alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Defendant JJDS is a Utah limited liability company with its offices and principal place of business in Salt Lake County, State of Utah.

2.      Plaintiff Ensign is a Utah corporation with its offices and principal place of business in Salt Lake County, State of Utah.

3.      Plaintiff Mitchell is a Utah limited liability company with its offices and principal place of business in Salt Lake County, State of Utah.

4.      Defendant LA Construction, Inc. ("LA") is a Utah corporation with its offices and principal place of business in Salt Lake County, State of Utah.

5.      Third-party Defendant Alma Jessop ("Alma Jessop") is the corporate principal and president of Defendant LA and is an individual residing in Salt Lake County, State of Utah.

6.      Third-party Defendant Tammy Lynn Jessop ("Tammy Jessop") is the wife of Alma Jessop, and is an individual residing in Salt Lake County, State of Utah.

7.      Third-party Defendant Brighton Bank ("Brighton") is a Utah corporation with its offices and principal place of business in Salt Lake County, State of Utah.

8.      Third-party Defendants John Does 1-5 are individuals, partnerships, corporations, or other entities who are account holders either jointly with LA or Alma Jessop, or to whose accounts LA or Alma Jessop have diverted construction loan funds and who have knowingly and willingly acquiesced in such diversion, but whose names and identities have not yet been ascertained by JJDS. Pursuant to Utah R. Civ. P. 9(a)(2), JJDS prays the Court for leave to amend this responsive pleading when the true names and identities of such defendants have been ascertained.

11

9.    Third-party Defendant Concrete Connection, Inc. ("Concrete Connection") is a Utah corporation with its offices and principal place of business in Salt Lake County, State of Utah. Any causes of action previously pleaded by JJDS against Concrete Connection have been resolved and dismissed.

10.    Jurisdiction is proper in this Court pursuant to Utah Code Ann. § 78-3-4.

11.    Venue is proper in this Court pursuant to Utah Code Ann. §§ 78-13-1, and -7.

GENERAL ALLEGATIONS

12.    JJDS incorporates all responses given in its Answer above as though fully set forth herein.

13.    JJDS was formed in late 2000 for the purpose of conceiving, constructing and operating a wedding reception center.

14.    In January 2001, JJDS purchased real property located at 1313 East Pioneer Road, Draper, Utah for the purpose of constructing and operating a wedding reception center (hereinafter referred to as "the Project" or "the Property").

15.    On or about January 23, 2001, JJDS contracted with Brighton for a construction loan to finance construction of the Project. (Construction loan attached hereto as Exhibit "A.")

16.    The parties' construction loan documents identified LA as the general contractor for the Project.

12

17.     The parties' construction loan documents provided for monthly requests to be made and signed by JJDS for draws from the loan proceeds for the payment of the general contractor and relevant subcontractors, suppliers and other parties, and provided that Brighton advance such draws by means of either: (1) joint check to JJDS and LA or relevant subcontractors and suppliers; or (2) direct payment to LA and relevant subcontractors and suppliers identified in the draw request.

18.     In early 2001 JJDS engaged Henshaw Drafting & Design as architects and Thompson-Hysell Engineering as engineers to design and draft architect plans, site plans and preliminary engineering plans for the Project (collectively "the Drawings").

19.     JJDS engaged LA as the general contractor for the Project, and on March 3, 2001, JJDS and LA entered into and executed a Construction Agreement outlining the scope of the Project as well as the parties' respective obligations and benefits under the Agreement.  (Construction Agreement, attached hereto as Exhibit "B.")

20.     LA's construction work was to be carried out in accordance with the Drawings provided by JJDS, and such Drawings were expressly incorporated into the terms and conditions of the Construction Agreement.

21.     LA was to perform its work on the Project for a guaranteed price of $957,904.17, subject to any subsequent change orders or modifications agreed to by both LA and JJDS.

13

22.     The Guaranteed Price was later revised downward, at Brighton's insistence, to $914,594.17. This revision was made by dropping $50,000.00 from the landscaping budget and making other minor revisions to the overall budget.

23.     The necessary building permits were obtained from Draper City in the spring and summer of 2001, and work on the Project commenced pursuant to those permits.

24.     Prior to the first construction loan draw, LA approached Mitchell to inform Mitchell that LA was unable to access construction loan funds for certain underbid and unanticipated construction expenses. LA asked Mitchell to create an invoice to intentionally identify and itemize excavation work in an amount greater than actually performed in order to obtain construction loan funds on LA's behalf that LA would not otherwise be entitled to at that point in the construction process. LA and Mitchell agreed to generate a Mitchell invoice for approximately $12,000 more than the value of the actual work provided. Mitchell would submit the fabricated invoice to LA for payment, Mitchell would sign over the loan proceeds check received from Brighton to LA in return for LA's future payment of $6,000.00; and LA would thereby immediately receive construction loan proceeds in the amount of the fabricated invoice.

25.     The first draw on the construction loan was made on March 19, 2001. The draw was signed and approved by JJDS, and payments were made directly to identified responsible subcontractors for work and materials already provided to the Project. This draw was coordinated, verified and released by Steven Fraser, Brighton's loan officer assigned to handle this particular

14

construction loan. As part of the first draw, a check for $18,139.72 of funds earmarked for Mitchell, was made out and paid directly to Mitchell for the intentionally overbilled invoice referenced in ¶ 24 above, and Mitchell endorsed such payment over to LA pursuant to the parties' agreed-upon scheme.

26.     The second draw on the construction loan was made on April 20, 2001, and was handled in similar fashion by Mr. Fraser, with payments being made out and paid directly to identified responsible parties.

27.     The third draw on the construction loan was made on May 9, 2001, and was handled in similar fashion by Mr. Fraser, with payments being made out and paid directly to identified responsible parties.

28.     At some time between the third and fourth draws on the construction loan, Ms. Traci Nelson replaced Mr. Fraser as the Brighton employee overseeing and administering the Project's construction loan.

29.     In June 2001, LA requested a fourth draw on the construction loan in a total amount of $61,170.09. Of this sum, $51,170.09 was earmarked for payment to Mitchell.

30.     Beginning with the fourth draw, Ms. Nelson, pursuant to Alma Jessop's requests, decided to disburse and pay the entire amount of the draw proceeds directly and solely to LA rather than directly to LA and directly to relevant subcontractors and suppliers as required by the construction loan agreement. The fourth draw on the construction loan was made on June 13, 2001,

15

and made out and paid directly and wholly to LA. Brighton neither informed nor gave JJDS opportunity to approve of this departure from established and expected disbursement procedure. JDDS was never informed, and did not learn until several months later, that Mitchell had not been paid in full the $51,170.09 in funds originally earmarked to Mitchell from the fourth draw.

31.    The draw sheet associated with the fourth draw contains no signature from a representative of JJDS, and bears handwritten notations with the instructions, "Per Traci—Do 1 ck to LA for whole amount."

32.    Subsequent to the fourth draw, Alma Jessop took construction loan funds disbursed directly to LA and deposited the same into at least one personal bank account together with other corporate accounts through which, upon information and best belief, he either misappropriated such funds to personal or unrelated corporate use, improperly commingled such funds with personal or other corporate funds, or otherwise dissipated such funds in a fashion entirely inconsistent with the agreed purposes of the parties' construction contract.

33.    Construction funds deposited by Alma Jessop into personal accounts and LA corporate accounts were used to pay, among other personal expenses, mortgage payments and credit card bills.

34.    Tammy Jessop was a joint holder of a personal loan and the primary account holder of a consumer credit card that construction loan proceeds ultimately paid. As such, Tammy Jessop received the benefit of the construction loan funds in an amount no less than $21,500.00. Several

16

other withdrawals of construction loan funds were marked for mortgages, personal loans, or cash, which amounts may have personally benefitted either Alma Jessop, Tammy Jessop, or both.

35.    Prior to the fourth draw, all subcontractors and suppliers had been paid in a timely fashion.  Subsequent to the fourth draw, JJDS first began receiving complaints that subcontractors and suppliers were not being paid for labor, material and services provided to the Project.

36.    Of the amounts received under the fourth draw, LA paid to Mitchell only $32,126.76 of the earmarked $51,170.09.  The remaining $19,043.33 of the funds earmarked for Mitchell and disbursed directly to LA in the fourth draw is unaccounted for, and to date LA has failed or refused to provide any accounting as to how and in what manner such remaining funds may have been disbursed or dissipated.  Mitchell has filed a mechanics lien on the Project property for amounts that include the fourth draw proceeds that were never paid to Mitchell.

37.    Of the $32,126.76 paid by LA to Mitchell, approximately $6,000.00 of this amount was LA's promised reimbursement to Mitchell for Mitchell's cooperation and participation in the overbilling scheme identified in ¶ 24 above.

38.    In July, 2001, LA requested that the entire amount of the fifth draw, in an amount of $46,180.21, be paid directly and entirely to LA.  LA failed to identify any responsible subcontractors in relation to this draw.  Ms. Nelson approved the draw, and paid all funds directly to LA on July 10, 2001.  LA has never provided the supporting subcontractor invoices associated with this draw,

17

and to date has failed or refused to document that any funds disbursed pursuant to the fifth draw were ever used on the Project or paid to relevant subcontractors and suppliers.

39.     In August, 2001, LA again requested that the entire amount of the seventh draw, in an amount of $52,612.52, be paid directly and entirely to LA. LA failed to identify any responsible subcontractors in relation to this draw. Ms. Nelson approved the draw, and paid all funds directly to LA on August 22, 2001. The draw sheet contains no signature from a JJDS member or agent. LA has never provided the supporting subcontractor invoices associated with this draw, and to date has failed or refused to document that any funds disbursed pursuant to the seventh draw were ever used on the Project or paid to relevant subcontractors and suppliers.

40.     Analysis of Project documents reveals that a significant proportion, if not all of the funds disbursed in the seventh draw were not disbursed, or could not have been disbursed, in the manner stated in the draw. Many of the construction items identified in the draw had not even commenced at the time of the disbursement, and many of the relevant contractors have indicated that they never received any portion of the funds disbursed in this draw, and JJDS and/or its members have paid subcontractors out of pocket for amounts that should have been paid from the draw amounts disbursed directly to LA.

41.     Analysis and investigation of the amounts disbursed under the draws and the amounts actually received by relevant contractors on the Project indicates that approximately $140,000 of construction loan funds, exclusive of amounts allocable to builder's overhead and profit margin,

18

were deposited in LA's or Alma Jessop's bank accounts from approximately March 2001 through March 2002, and that of this amount, only $81,716.76 was actually used to pay subcontractors and suppliers providing work on the Project, and that the remaining amount of over $58,000.00 originally earmarked for specific work and subcontractors on the Project has yet to be accounted for, and may have been misappropriated, misapplied or wrongfully dissipated by LA and/or Alma Jessop.

42.     Draw number eight on the Project was disbursed by Brighton without the draw request being signed by JJDS, and a payment made to Burton Lumber from this amount which, upon information and best belief, was used to pay off the entirety of LA's open credit account with Burton Lumber rather than pay off only those materials provided to and used on the Project.

43.     As JJDS learned that subcontractors and suppliers on the Project increasingly were not receiving the funds to which they were entitled under the several draws on the construction loan, JJDS took a more affirmative role to ensure that funds from the ninth draw onward were paid directly to responsible subcontractors on the Project.

44.     The misappropriation of construction loan funds has led to subcontractors filing liens on the Project property, and significant interest expenses incurred due to JJDS's protracted inability to refinance the Project property at a lower rate due to the several sizable mechanics liens attached to the Project property. Furthermore, JJDS was forced to pay otherwise unpaid subcontractors out-

19

of-pocket in order to complete the Project and minimize the number and extent of mechanics liens filed against the Project property.

45. Because of the delays to the Project occurring as a direct result of LA's and Jessop's misappropriation of construction loan funds and attendant failure to pay subcontractors and suppliers, LA failed to complete the Project in either the time, fashion, manner or cost as contracted, and its failure to do so was the direct cause of the monetary damages suffered by JJDS and as outlined below.

## FIRST CAUSE OF ACTION
### (LA Construction - Breach of Contract)

46. JJDS incorporates the allegations of ¶¶ 1-45 and the allegations of the above Answers as if alleged verbatim herein.

47. LA has materially breached the parties' Construction Agreement, by, among other things: (a) failing to complete the Project in a timely manner, and subjecting the Project's completion to lengthy and continued delays; (b) misappropriating construction loan funds earmarked for the Project and failing to pay suppliers and subcontractors with funds from the construction loan earmarked for such suppliers and subcontractors, thereby inducing multiple mechanics liens to be filed upon the property; and (c) unilaterally changing engineering and design plans and specifications without input or approval from JJDS. Such breaches resulted in error, defective work, costly re-work, delay, increased costs and lost operating income.

20

48.     Upon information and best belief, LA failed to pass through construction loan funds in an amount exceeding $58,000.00, and/or misallocated portions of the same to areas of the Project for which they were not intended, causing delay, non-payment of suppliers and subcontractors, and unnecessary liens on the Project property

49.     JJDS has had to pay out monies over and above the agreed contract price in order to complete the Project and to pay subcontractors and suppliers left unpaid by LA.

50.     The payments made over and above the agreed contract price were not legitimate costs pursuant to a mutually-agreed change order or modification, but were rather the result of LA's failure to follow approved drawings and specifications, poor or defective workmanship, faulty supervision, or failure or refusal to pass through draws from the construction loan, and are more particularly identified in the following particulars and amounts:

        a.     Damages of at least $87,000.00 attributable to LA's failure to build in accordance with plans, i.e., items clearly included and identified in the drawings and specifications, but ignored or unfinished, and deliberate but unapproved deviations by LA from approved plans;

        b.     Damages of at least $200,000.00 attributable to LA's failure to construct the Project for the parties' contractual "Guaranteed Price";

        c.     Damages of at least $52,000.00 attributable to construction or engineering errors, and which have either been repaired at JJDS's expense or have yet to be repaired;

21

d.     Damages of at least $113,000.00 attributable to LA's failure to finish the Project within a reasonable or the promised time frame; and

e.     Damages of $19,067.00 attributable to fees paid out-of-pocket by JJDS to Draper City and for which LA was contractually responsible, absent which the Project could not progress, and for which LA promised JJDS reimbursement, but which LA has failed or refused to pay.

51.     All amounts identified in ¶ 50 above were directly caused by LA's material breaches of the parties' Construction Agreement, and LA is liable to JJDS for the same.

52.     No mutually agreed upon change order or modifications were executed which could serve as a basis for modifying the Guaranteed Price amount identified in the parties' Construction Agreement, and no significant changes from the original Drawings were ever requested or authorized by JJDS in relation to the Project.

SECOND CAUSE OF ACTION
(LA Construction - Breach of Duty of Good Faith and Fair Dealing)

53.     JJDS incorporates the allegations of ¶¶ 1-52 and the allegations of the above Answers as if alleged verbatim herein.

54.     LA owed a duty to deal with JJDS fairly and in good faith, as such a duty inheres in every contract.

22

55.     The above-referenced numerous and continuing material breaches by LA constitute a breach of its duty of good faith and fair dealing owed to JJDS under the parties' Construction Agreement.

56.     JJDS has been damaged by LA's breach of its duty of good faith and fair dealing in the amount, extent and particulars detailed above.

### THIRD CAUSE OF ACTION
(LA Construction, Alma Jessop - Fraud)

57.     JJDS incorporates the allegations of ¶¶ 1-56 and the allegations of the above Answers as if alleged verbatim herein.

58.     LA and Alma Jessop colluded with Mitchell to intentionally overbill JJDS by an amount of approximately $12,000.00 for work never performed on the Project, and to affirmatively represent that such purported work had actually been performed, in order for LA and Alma Jessop to obtain control over construction loan funds that would otherwise not be disbursed to them, and LA and Alma Jessop used such funds for purposes other than those for which they were designated.

59.     Throughout the course of the Project, LA received periodic disbursements and draws from the construction loan funded by Brighton for the express purpose of paying in full subcontractors and suppliers working on and providing material and supplies to the Project.

60.     During the course of the construction project, Alma Jessop and/or LA deposited certain of the construction loan draws disbursed to LA, in a total cumulative amount of over

23

$140,000.00, into certain LA corporate accounts together with one of Alma Jessop's personal and individual bank accounts held under his name.

61.     At roughly the same point in time during the Project that Alma Jessop began depositing construction loan funds disbursed to LA and earmarked for subcontractors and suppliers on the Project into his corporate or personal accounts, significant numbers of subcontractors and suppliers began to complain to JJDS and its members of LA's failure or refusal to pay them either partially or in full for work and materials supplied to the Project.

62.     LA and/or Jessop intentionally or recklessly misappropriated construction loan funds released to LA for use on the Project, and misappropriated the same for either Alma Jessop's or Tammy Jessop's personal use or misallocated and expended the same on other unrelated LA construction projects or obligations.

63.     At the time that LA and/or Alma Jessop convinced Brighton and Ms. Nelson to release construction loan draws wholly and entirely to LA, and at such time as LA received such draws in their entirety, LA and/or Alma Jessop represented to Brighton that LA would disburse and pay from such draws all relevant subcontractors and suppliers who had completed work and services on the Project during the relevant draw periods.

64.     LA and/or Alma Jessop's representations concerned the presently existing material fact of its intended payment to subcontractors and suppliers who had performed work and provided

24

materials and services to the Project, as well as that certain unperformed work had actually been performed.

65.     LA and/or Alma Jessop's representations regarding payment and disbursement of monies, or of work actually performed, were false to the extent that LA and/or Alma Jessop misappropriated such monies to other uses or other construction projects, commingled such funds with Alma Jessop's personal funds, misappropriated such funds to the personal use and benefit of third parties such as Tammy Jessop together with the personal use and benefit of Alma Jessop, or otherwise failed to pay relevant subcontractors and suppliers on the Project to whom funds from construction loan draws were allocated.

66.     At such time that LA and/or Alma Jessop obtained construction loan draw funds and deposited them into Alma Jessop's individual accounts, they knew their representations of payment to relevant subcontractors and suppliers, or of work actually performed, to be false, or such representations were made recklessly with little or no intent of actually making such payments in either a timely fashion or in the amounts allocable to the identified payees.

67.     LA and/or Alma Jessop made such false representations for the purpose of inducing Brighton and JJDS to release certain construction loan draw funds wholly and entirely to LA for subsequent misappropriation to uses or persons not associated with the Project, or to release such funds on the basis of purported work that had not been performed.

25

68.     Brighton and JJDS, acting reasonably and in ignorance of the false nature of LA and/or Alma Jessop's representations of actual work performed or direct payment to relevant subcontractors and suppliers in releasing draws to LA, relied upon LA and/or Alma Jessop's representations in doing so, and was induced by such representations to accede to LA and Alma Jessop's requests.

69.     As a direct and proximate result of LA and/or Alma Jessop's misappropriation, misallocation and wrongful dissipation of construction funds released to LA solely for use on the Project, JJDS was forced to pay otherwise unpaid subcontractors and suppliers on the Project a sum no less than $58,000.00 out-of-pocket in order to complete the Project and commence scheduled business operations, and was induced to pay construction funds to Mitchell for work that had not been performed.

70.     As a direct and proximate result of LA and/or Alma Jessop's misappropriation, misallocation and wrongful dissipation of construction funds released to LA solely for use on the Project, several subcontractors and suppliers remain unpaid for material and services supplied to the Project, and mechanics' liens in a total cumulative amount (excluding LA's lien) of at least $70,000.00 have been filed against the Property and continue to act as a cloud upon title.

71.     As a direct and proximate result of LA and/or Alma Jessop's misappropriation, misallocation and wrongful dissipation of construction funds released to LA solely for use on the Project, JJDS has suffered other consequential damages, including at least $50,000.00 in interest

26

costs due to JJDS's inability to secure financing at lower market interest rates as a direct result of the several mechanics liens encumbering the Property, and has been damaged in other particulars in an amount to be proved at the trial of this matter.

FOURTH CAUSE OF ACTION
(LA Construction, Alma Jessop - Breach of Fiduciary Duty)

72.    JJDS incorporates the allegations of ¶¶ 1-71 and the allegations of the above Answers as if alleged verbatim herein.

73.    As a general contractor and LA's corporate president, Alma Jessop had a strict fiduciary duty, shared with LA, to ensure that the proceeds of the construction loan which were disbursed to LA were allocated and used solely for the payment of subcontractors and suppliers working on and providing material and supplies to the Project and were in payment for actual work performed on the Project, and for any allowable profit and overhead as may be allowed LA by contract, and to not use or divert such earmarked funds for any other purpose.

74.    As a general contractor and LA's corporate president, Alma Jessop had a strict fiduciary duty, shared with LA, to not commingle proceeds of the construction loan disbursed to LA with Alma Jessop's personal funds, run them through Alma Jessop's individual accounts, or to disburse, dissipate or otherwise expend them on persons, uses or materials not associated nor connected with the Project for which they were expressly earmarked and meant to fund.

27

75.     Alma Jessop and LA have breached their strict fiduciary duties in the manner alleged above, and JJDS has been harmed by LA's and Alma Jessop's breach of their strict fiduciary duty in the manner and particulars alleged above.

## FIFTH CAUSE OF ACTION
(LA Construction - Wrongful Lien; Abusive Lien)

76.     JJDS incorporates the allegations of ¶¶ 1-75 and the allegations of the above Answers as if alleged verbatim herein.

77.     An amount totaling $903,242.33 has been released by the commercial lender to LA or directly to subcontractors or suppliers in consideration of the parties' Construction Agreement.

78.     Despite the fact that at least $903,242.33 has been paid out on the Guaranteed Price amount of $914,594.17, and the fact that through negligence, defective workmanship, material breaches of contract, delay, misappropriation and misallocation of construction funds, and defective and unauthorized engineering and design changes, LA has directly occasioned at least $471,067.00 in damages and out-of-pocket costs to JJDS and for which LA has failed or refused to reimburse JJDS or contribute in any fashion, LA has nonetheless filed a mechanic's lien on the Project property.

79.     LA's Mechanics' Lien includes amounts identified in other subcontractors' liens for which LA has neither paid nor is out-of-pocket; alleged change orders or cost increases that have in fact been paid for out of pocket by JJDS and for which LA has neither paid nor is out-of-pocket;

28

overhead, profit, and change order fees for work and changes that LA neither performed nor paid for; and other spurious items for which LA has neither paid nor is out-of-pocket.

80.     LA's Mechanics' Lien is without supportable basis, and has not been filed in good faith.

81.     LA's Mechanics' Lien constitutes a wrongful lien as defined under Utah Code Ann. §§ 38-9-1 et seq.

82.     Alternatively, LA's Mechanics' Lien is an abusive lien as defined under Utah Code Ann. § 38-1-25.

83.     LA's wrongful or abusive lien has resulted in adverse consequences to JJDS beyond cloud of title, and has significantly delayed refinancing at a lower rate needed to allow JJDS to keep operating at at least a break-even operating margin, and has resulted in significant additional interest charges during such delay.

84.     LA's wrongful or abusive lien has caused JJDS damages in an amount to be proved at the trial of this matter.

SIXTH CAUSE OF ACTION<br>(Alma Jessop, Tammy Jessop - Money Had and Received)

85.     JJDS incorporates the allegations of ¶¶ 1-84 and the allegations of the above Answers as if alleged verbatim.

29

86. Alma Jessop and Tammy Jessop (collectively "the Jessops") received construction loan funds in an amount no less than $58,000.00 that were otherwise meant for exclusive use on the Project.

87. The Jessops received and materially benefitted from such funds without providing any measure of corresponding consideration or value.

88. The Jessops received and materially benefitted from such funds under such circumstances that in equity and good conscience such funds should be returned.

89. The Jessops' receipt of construction loan funds has deprived JJDS and relevant subcontractors and suppliers on the Project of loan funds to which they are rightfully entitled and for which they have provided valid and corresponding consideration.

SEVENTH CAUSE OF ACTION
(Alma Jessop, Tammy Jessop - Unjust Enrichment)

90. JJDS incorporates the allegations of ¶¶ 1-89 and the allegations of the above Answers as if alleged verbatim herein.

91. A gratuitous material benefit was conferred on the Jessops at such time as they received construction loan funds meant entirely for use on the Project and they applied such funds to personal use and benefit, such as the payment of personal loans and credit card balances, among other things.

30

92.     Based on information and best belief, the Jessops appreciated or had knowledge that funds they accessed and from which they materially benefitted were construction loan proceeds meant for exclusive use on the Project.

93.     Acceptance or retention by the Jessops of the benefits enjoyed from the construction loan funds is inequitable so long as the Jessops fail or refuse payment of corresponding value to the funds' intended recipient(s).

94.     The Jessops have been unjustly enriched to the material detriment of JJDS and relevant subcontractors and suppliers on the Project to whom such construction loan funds were rightfully payable and for which such subcontractors and suppliers have provided valid and corresponding consideration.

EIGHTH CAUSE OF ACTION
(Alma Jessop, Tammy Jessop - Conversion)

95.     JJDS incorporates the allegations of ¶¶ 1-94 and the allegations of the above Answers as if alleged verbatim herein.

96.     The Jessops' receipt and use of construction loan funds for personal benefits constituted an act of willful interference with funds to which they neither had title nor possessory interest.

97.     The Jessops' receipt and use of construction loan funds for personal benefit was done without lawful justification.

31

98. The Jessops' receipt and use of construction loan funds for personal benefit deprived JJDS and/or relevant subcontractors and suppliers of the use and immediate possession to which they were otherwise entitled and for which they had provided valid and corresponding consideration.

## NINTH CAUSE OF ACTION
(Brighton Bank - Breach of Contract)

99. JJDS incorporates the allegations of ¶¶ 1-98 and the allegations of the above Answers as if alleged verbatim herein.

100. Brighton had a contractual and fiduciary duty to advance construction loan funds pursuant to JJDS's draw requests either by means of: (1) a joint check to JJDS and LA or any relevant subcontractors and suppliers; or (2) direct payment to LA and relevant subcontractors and suppliers.

101. At such time as Ms. Nelson authorized and disbursed construction loan funds directly and wholly to LA but not to relevant subcontractors and suppliers, Brighton breached its contractual and fiduciary duties to ensure payment of relevant subcontractors and suppliers.

102. LA's and Alma Jessop's misappropriation and misallocation of construction loan funds was a direct and proximate result of Brighton's breach of its contractual and fiduciary duties in paying construction loan funds wholly over to LA and not also to relevant subcontractors and suppliers.

103. The misappropriation of construction loan funds has led to subcontractors filing liens on the Project property in a current outstanding amount of over $70,000.00 (excluding LA's lien),

32

as well as other consequential damages discussed above. Furthermore, JJDS was forced to pay otherwise unpaid subcontractors out-of-pocket in order to complete the Project and minimize the number and extent of mechanics lien filed against the Project property.

104.    Several of the construction loan funds disbursements were made without the contractually-required signature of a JJDS representative. These unauthorized draws total an amount of nearly $189,000.00, of which over $63,000.00 remains unaccounted for, and of which additional sums may have been improperly paid to subcontractors and suppliers for work not performed on or allocable to the Project.

105.    JJDS has suffered monetary damages as a direct result of Brighton's breach of its contractual and fiduciary duties, as well as recognized industry standards, in an amount to be proved at the trial of this matter.

TENTH CAUSE OF ACTION
(Brighton Bank - Breach of Fiduciary Duty)

106.    JJDS incorporates the allegations of ¶¶ 1-105 and the allegations of the above Answers as if alleged verbatim herein.

107.    Brighton owed JJDS a fiduciary duty of care by virtue of the power of attorney vested in it pursuant to the parties' Construction Loan Agreement.

108.    Brighton breached its fiduciary duties to JJDS in the manner and particulars alleged above.

33

109.   Brighton and its authorized personnel failed to follow recognized industry standards by disbursing construction loan draws directly and in their entirety to LA when JJDS had approved and established a process of releasing earmarked funds directly to the responsible subcontractors, and in failing to make earmarked payments of the same to identified responsible contractors, and Brighton's breach of its duty to follow reasonable and recognized industry standards of disbursements is a direct and proximate cause of the accrued and continuing damages JJDS has suffered.

110.   Brighton and its authorized personnel failed to follow recognized industry standards by failing to either ensure or recommend that a first-time construction loan borrower obtain a payment bond to protect the borrower and provide security from mechanics lien claims, and Brighton's breach of its duty to follow reasonable and recognized industry standards in relation to securing payment bonds is a direct and proximate cause of the accrued and continuing damages JJDS has suffered from the multiple mechanics liens filed on the property, which are the direct result of the malfeasance of LA and/or Alma Jessop on the Project made possible by Brighton's breach of industry standards of construction loan disbursement.

111.   JJDS has been harmed by Brighton's breach of its fiduciary duty in the manner and particulars alleged above.

34